RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 12a0393p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SAMUEL A. CAMPBELL and CHELSIE
GEMPERLINE,

                        *Plaintiffs-Appellees*,

        *v.*

THE CITY OF SPRINGBORO, OHIO; JEFFREY
KRUITHOFF, individually and in his official
capacity as Chief of Police; NICK CLARK,
individually and in his official capacity as
Police Officer for the City of Springboro,
Ohio,

                *Defendants- Appellants*.

> No. 11-3589

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:08-cv-737—Susan J. Dlott, Chief District Judge.

Argued: June 5, 2012

Decided and Filed: November 29, 2012

Before: KEITH, McKEAGUE, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Wilson G. Weisenfelder, Jr., RENDIGS, FRY, KIELY & DENNIS, LLP,
Cincinnati, Ohio, for Appellants. Matthew C. Schultz, BRANNON & ASSOCIATES,
Dayton, Ohio, for Appellees. **ON BRIEF:** Wilson G. Weisenfelder, Jr., RENDIGS,
FRY, KIELY & DENNIS, LLP, Cincinnati, Ohio, for Appellants. Dwight D. Brannon,
Douglas D. Brannon, BRANNON & ASSOCIATES, Dayton, Ohio, for Appellees.

     DONALD, J., delivered the opinion of the court in which KEITH, J. joined, and
McKEAGUE, J., joined in Parts II.A and II.D. McKEAGUE, J. (pp. 16–23), delivered
a separate opinion dissenting from Part II.B, Part II.C, and the result.

———————————

**OPINION**

———————————

BERNICE B. DONALD, Circuit Judge.  Plaintiffs Samuel Campbell and Chelsie Gemperline were attacked on October 20, 2007 and October 11, 2008, respectively, by a police dog with the canine unit of the Springboro Police Department.  Plaintiffs filed suit under 42 U.S.C § 1983 against the canine's handler, the chief of police, and the City of Springboro, alleging excessive force, failure to supervise, and failure to properly train.  Plaintiffs also asserted state law claims for assault and battery.  The district court denied Defendants' motion for summary judgment.  For the foregoing reasons, we **AFFIRM** the district court's denial of summary judgment.

**I.**

In 2004, the Springboro Police Department ("SPD") selected Officer Nick Clark to form the department's first canine unit.  The Chief of Police, Jeffrey Kruithoff, placed Clark in charge of selecting a dog and a training program.  Clark chose a dog named Spike from Lynwood Kennels, a company that specializes in training canines and their handlers for law enforcement purposes.  Lynwood Kennels provided the initial core training – a 300-hour canine handling course that Officer Clark and Spike completed in May, 2005.  After completing that training, Spike and Clark obtained state certification.  According to Officer Clark, the State of Ohio requires that canine units be regularly certified by the Ohio Peace Officer Training Commission and the Office of the Attorney General ("Ohio Training Commission") in order to remain in compliance.

The SPD deployed Spike in the field immediately after he became state certified.  Clark was responsible for making sure that Spike fulfilled training requirements.  Clark believed that he and Spike were supposed to complete eight hours of maintenance training every other week to make sure Spike stayed sharp and did not develop bad habits.  Brian Woods, the operator of Lynwood Kennels and a master trainer, testified that the monthly maintenance training should encompass all disciplines, including

narcotics detection, tracking, obedience, bite training, and reasonable force training with a particular focus on any problem areas. Without such training, the dog's level of obedience may erode over time and the dog may not respond as well to the handler's commands. Clark admitted that he and Spike did not always engage in maintenance training on a regular basis. Spike received no training between September 19, 2007 and October 21, 2007, the date of the Campbell incident. Spike also received no training for over thirty days prior to the Gemperline incident, which occurred on October 11, 2008. Officer Clark testified that although his supervisors were aware that Spike's training was not current, they failed to allot sufficient time for training.

Prior to both bite incidents at issue in this case, Officer Clark notified his supervisors that he had been unable to keep up with the maintenance training and repeatedly requested that they allow him time to attend training sessions, but his requests were denied. Spike's state certifications lapsed for several months during the summer of 2007. The renewal deadlines for those certifications were April 28 and May 12, 2007. Spike was not actually re-certified until September 26, 2007. During his deposition, Clark testified that a police dog cannot be in service in Ohio unless the certifications are renewed. However, he interpreted the "renewal due date" posted on the certification forms not as a deadline, but rather as the earliest date upon which renewal can occur. During the lapse in Ohio certification, Spike was deployed in the field approximately ten times. Clark testified that within that time period, he notified Kruithoff and another supervisor that the certifications had expired. Spike's recertification occurred prior to the dates of the two bite incidents at issue in this case.

Kruithoff testified that he never specifically designated any member of his command staff to supervise the canine unit or to ensure that Spike was suitable for duty. Instead, oversight of the canine unit fell to the officers serving as Clark's supervising lieutenant and sergeant at any given time. Similarly, Lieutenant Wheeler testified that Officer Clark oversaw his own training.

While Woods and Clark agreed that Spike was trained as a "bark and hold" dog, they sharply disagreed on how he was trained to behave in a tracking situation. Woods

explained that a "bark and hold dog is trained that if a person gets up and surrenders, the dog will not engage you. He will literally detain him or bark and hold him until such time as the person either attacks, flees, or is called [] back by the handler." "[I]f the dog is trained in a bark and hold, that is what he should do...." According to Clark, however, the "bark and hold" approach does not apply in a tracking situation. Clark testified that when engaged in a fugitive track, even where the subject was compliant and not attempting to resist or flee, Spike was expected to bite the subject unless Clark saw the subject and restrained Spike verbally or physically.

There was similar disagreement on the subject among the testifying police officers. Chief Kruithoff believed during a track that Spike was not supposed to bite the subject if the subject remained still. Similarly, Lt. Wheeler indicated that Clark had told him that a bark and hold dog is supposed to first bark at a subject to indicate the subject's presence. If the subject makes any movement, the dog is expected to "bite and hold." According to Lt. Parker, on the other hand, bark and hold doesn't apply during tracks, because it only applies to "off-leash" situations. He further testified that a tracking canine would always bite upon encountering a subject, unless the handler commands otherwise before the dog engages. [1]

The evidence shows that Spike was involved in biting incidents with growing frequency in the first three years of his deployment in the field. In 2005, he successfully apprehended three suspects, none of whom were bitten. In 2006, Spike apprehended fourteen suspects, five of whom he bit. In 2007, he bit five of the six suspects apprehended.

## A. **Campbell Incident**

On the evening of October 20, 2007 Samuel Campbell had gone out with his girlfriend, Lisa Parker, and another couple to a nightclub. At approximately 12:30 a.m., Parker decided to leave the club and walk home because she was intoxicated. When

---

[1]This conflicting testimony is at odds with the dissent's observation that "there appears to be no dispute about the fact that Spike performed as he had been trained to perform."

Campbell later decided to leave the club, he realized that he had Parker's car keys and needed to return them to her. When he arrived at Parker's house, he could see her through the window in the front door, lying on the couch. He pounded loudly on the front door for about five or ten minutes, but was unable to rouse her. Campbell walked around to the back and pounded on the back door for another two to three minutes, and then returned to the front of the house. Meanwhile, the tenant in the other half of Parker's duplex who had heard all of the pounding called the Springboro Police Department about the noise.

Officers Clark and Anderkin were dispatched to Parker's residence to respond to a possible domestic situation involving a male subject beating on Parker's front door. By the time the officers got to the scene, Campbell had already left Parker's residence and had begun to head toward his house on foot through Parker's backyard. Campbell heard the approaching sirens and suspected that a neighbor may have called the police because he had been pounding loudly on Parker's door. He decided to lie on the ground near an outbuilding in an attempt to avoid a confrontation with the police.

The neighbor told Anderkin that Parker's residence had recently been broken into and that at some point she had received death threats from someone. The neighbor also stated that he had seen a white male, later determined to be Campbell, kick the front door and then run around the side of the house as the officers approached. The officers then attempted unsuccessfully to rouse Parker by pounding on the back and front doors to the residence. They noticed that the doors appeared damaged, but they were unable to gain entry to the residence because both of the doors were securely locked. Clark testified it was their belief that the suspect had fled upon hearing police sirens, leading the officers to conclude that they were dealing with an attempted burglary and that the suspect was likely still in the area.

After outfitting Spike in a harness and twenty-foot tracking line, Clark deployed him near the side of the house. Spike eventually led the officers to a fence in an adjoining yard that led to the outbuilding near where Campbell had laid down on the ground. Clark maintains that he had no idea Campbell was that close and that he did not

actually see Campbell until after Spike bit Campbell.  Clark testified that he believed that Campbell was somewhere on the other side of the fence based on Spike's interest in jumping over the fence.  As a result, Clark claims, he was not looking at Spike at the exact moment that Spike retreated from the fence and bit Campbell; rather, at that moment Clark was turned toward Anderkin discussing ways to get around to the other side of the fence.  Campbell disputes Clark's testimony that he did not see Campbell until after Spike engaged.  Campbell testified that he was sure Clark saw him lying on the ground because when Clark and Spike were approximately twenty-five feet from him and approaching, Campbell raised his head, looked right at Clark, and their eyes met.  Campbell also stated that the area in which he lay was somewhat illuminated by a nearby light.  Both parties agree that neither Campbell nor Clark said anything prior to Spike biting Campbell.  Clark issued no warnings to Campbell, and Campbell said nothing to the officers.  Campbell contends and Anderkin's incident report reflects that when Spike engaged Campbell, Campbell was lying face down on the ground with his hands out to the side.  Spike bit Campbell on the left leg and continued to bite Campbell at different places on his leg for some period of time, possibly thirty to forty-five seconds.

**B. Gemperline Incident**

At approximately 1:30 a.m. on October 11, 2008, Clark was dispatched to 128 Deer Trail Drive, Springboro, Ohio to investigate a report of a loud party at which underage teens were believed to be drinking alcohol.  Based on his own observations, Clark determined that he was in fact dealing with a party involving underage drinking and requested backup.  Several officers from the SPD and other local police departments, including SPD Sergeant Aaron Zimmaro, responded to the scene.  Both Sergeant Zimmaro and Officer Clark observed that one of the teens, Chelsie Gemperline, appeared intoxicated.  After questioning her, Sergeant Zimmaro informed Gemperline that she was under arrest, placed her in handcuffs, and placed her in a patrol vehicle.  Gemperline became belligerent after Sergeant Zimmaro told her that she was under arrest.  Gemperline later slid her right hand out of the handcuffs, lowered the window of the car

and escaped. She fled down the street and hid in a children's plastic playhouse in the backyard of a house six to seven houses away from the location of the party.

After Clark was notified that Gemperline had escaped, he was heard saying, "Jeez Louise . . . [unintelligible] this bitch, . . . I've had it," and "[s]he's gonna get a nice rude awakening here in one second or two, . . . it's not gonna feel very good."[2] At Sergeant Zimmaro's request, Clark harnessed Spike, placed him on the same twenty-foot tracking line used in the Campbell case, and deployed him on a "tactical fugitive track." Spike led Clark into a fenced-in backyard on the opposite side of the street. As they entered the backyard, Clark interpreted Spike's air-scenting behavior as indicating that Spike smelled something on the deck of the house. Spike then darted across Clark's path and leapt head-first through the window of a child's playhouse that was located near the gate to the backyard. Spike was able to reach his head far enough through the window of the playhouse to nip Gemperline's chin and bite her right upper thigh. Gemperline screamed and grabbed Spike's jaws and tried to pry him off her leg. Spike briefly let go of her leg, but then he clamped down again. Gemperline continued to struggle with Spike until she either passed out or went into shock. Clark testified that as soon as he heard Gemperline scream he reached into the playhouse, grabbed Spike by his collar, and lifted straight up to cut off Spike's airway, a maneuver called a "choke off." Gemperline did not recall hearing Officer Clark say anything to her. Officer Clark testified that he could have, but did not shout any warnings when he entered the backyard with Spike.

## C. **Procedural History**

On October 20, 2008, Campbell filed suit against the City of Springboro, Chief Kruithoff, and Officer Clark alleging several violations of his civil rights under 42 U.S.C. § 1983 and assualt and battery. On June 29, 2009, Campbell amended his complaint to add Gemperline as a co-plaintiff. On October 15, 2010, Defendants filed a motion for summary judgment as to all claims alleged by both parties. On April 26,

---

[2]According to a department memorandum, Clark was believed to have made both statements, although Clark's vehicle recording device only captured the second statement.

2011, the district court denied the Defendants' summary judgment motion. Defendants finally filed the present appeal.

## II.

### A. <u>Qualified Immunity</u>

A district court's denial of qualified immunity, "to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291, notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Qualified immunity "shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011). In order to determine whether or not qualified immunity applies in an excessive force claim, the Court must engage in a two-step inquiry, addressing the following questions: (1) whether, considering the allegations in a light most favorable to the injured party, a constitutional right has been violated, and if so, (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008). When evaluating the defense of qualified immunity on a motion for summary judgment, the court must adopt the plaintiff's version of the facts. *Parsons*, 533 F.3d 492, 500. If, based upon these facts, no constitutional right was violated, there is no need for further inquiry. *Id.* However, if the court determines that a violation could be made out, the Court must then ask if the right was clearly established at the time of the alleged violation. *Id.*

### 1. Violation of Constitutional Right

Claims that police officers used excessive force in the course of an arrest are analyzed under the Fourth Amendment and the "objective reasonableness" standard. *Bennett v. Krakowski,* 671 F.3d 553, 561 (6th Cir. 2011) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). In applying the objective reasonableness test, the court is required to pay "careful attention to the facts and circumstances of each particular case,

including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

### a. Campbell

It is undisputed that prior to calling in the K-9 unit, the officers did not know the extent of the crime, if any, that Campbell had committed, or if he was actually armed. Clark stated that he did not believe that Parker was in any immediate danger and was not aware of a specific threat to anyone at the time. When the officers found Campbell, he was lying face down with his arms at his side. According to Campbell, he and Clark made eye contact prior to Spike engaging him. At no point was Campbell actively resisting arrest. Thus, Campbell has made out a colorable argument for excessive force based upon improper handling by Clark.

In addition, there is ample evidence to suggest that the deployment of Spike in the search for Campbell was itself irresponsible and therefore unreasonable, owing to Clark's failure to adequately maintain Spike's training. By Clark's own admission, Spike had issues with excessive biting and the failure to keep Spike on the accepted training regimen may well have played a role in Spike's aggressive behavior, which was, at least arguably, contrary to his training.

Viewing the facts in a light most favorable to the Plaintiff, the district court did not err in finding that a reasonable jury could find that Officer Clark's actions were unreasonable.

### b. Gemperline

Gemperline's crime of underage drinking, while reprehensible, is a relatively minor offense, and, under the circumstances at issue, posed no immediate threat to the safety of the officers or others. Although the officers argue that Gemperline was committing a felony by escaping from police custody, the crime was not violent, no weapons were found on her person, and she had not done anything to put anyone in harm's way. On the other hand, the officers were validly concerned for her safety

because she had been drinking and appeared to be intoxicated. After Gemperline escaped custody, they had no way of knowing if she would harm herself or attempt to cause harm to someone else, although they believed she might still be handcuffed.

The parties dispute whether or not Clark gave Gemperline a warning, but according to Gemperline, she was drifting off to sleep and Clark did not make himself known to her prior to Spike biting her. Viewing the facts in a light most favorable to the Plaintiff, she was arrested for a minor crime and was not in flight, nor was she a threat to anyone at the time she was apprehended. Based upon these facts, it appears that the actions of Clark, when apprehending Gemperline, were objectively unreasonable.

There is evidence suggesting that the real reason Clark chose to perform a choke-off may have been that Spike did not always respond to Clark's verbal commands as consistently as he should have. This evidence again suggests a possible causal link between Gemperline's injury and Spike's inadequate training.

Viewing the facts in a light most favorable to the Plaintiff, the district court did not err in finding that a reasonable jury could find that Officer Clark's actions were unreasonable.

### 2. *Clearly Established Right*

For a right to be "clearly established," "[t]he contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wheeler v. City of Lansing,* 660 F.3d 931, 938 (6th Cir. 2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent. *Id.* To resolve this question, this Court "must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *St. John v. Hickey*, 411 F.3d 762, 774 (6th Cir. 2005) (quoting *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002)).

The question before this Court is whether or not Plaintiffs' Fourth Amendment protections against excessive force, as it relates to the use of police dogs, was clearly established at the time the incidents occurred. The Sixth Circuit has addressed this issue in three relevant cases.

In *Robinette v. Barnes,* the court affirmed the grant of summary judgment in favor of the defendants where a burglary suspect was killed after being bitten by a police dog. 854 F.2d 909 (6th Cir. 1988). The suspect's estate filed suit claiming that the officers used unnecessary deadly force. *Id.* In finding that the officers were entitled to qualified immunity, the court stated:

> The facts indicate that Barnes had probable cause to believe that Briggs, a suspected felon hidden inside a darkened building in the middle of the night, threatened his safety and the safety of the other officers present. As the district court succinctly put it,
>
>> a reasonably competent officer would believe that a nighttime burglary suspect, who, the officers had good reason to believe, knew the building was surrounded, who had been warned ... that a dog would be used, and who gave every indication of unwillingness to surrender, posed a threat to the safety of the officers.
>
> Unlike the situation in *Garner,* this is not a case where a police officer shot a *fleeing* felon, a criminal suspect who, at least in part because of the fact he was fleeing, posed no threat to the officer. Instead, this is a case where an officer was forced to explore an enclosed unfamiliar area in which he knew a man was hiding. Under the totality of the circumstances, Barnes was justified in using whatever force was necessary, even deadly force, to protect himself and the other officers and to apprehend the suspect.

*Id.* at 913-14.

In *Matthews v. Jones*, the court relied on *Robinette* when it affirmed the district court's grant of summary judgment in favor of a police captain who used a police dog to apprehend a man who had fled on foot from pursuing officers after being pulled over for speeding and reckless driving. 35 F.3d 1046 (6th Cir. 1994). The court concluded:

> [W]e hold that there is no evidence whatever in this record which could support a claim that Roscoe was not used in an "appropriate manner." *See Robinette,* at 913. The record is clear that Officer Watkins not only warned Matthews several times before releasing Roscoe to apprehend him, but when he found Matthews lying in the weeds, his hands concealed beneath his body, Watkins explicitly ordered him not to move, advising that if Matthews remained still, Roscoe would be recalled. Matthews chose to move, and Roscoe enforced the order.

*Id.* at 1051.

In both *Robinette* and *Matthews,* the court determined that the suspects were potentially dangerous based upon the crimes they committed and their irrational behavior. Further, the spaces in which the suspects were located—an unlit unbuilding and a dark heavily wooded area—made police vulnerable to ambush. The court also found that the police dogs in these cases were properly trained and that the officers gave the suspects several warnings prior to allowing the dogs to engage the suspect.

On the opposite end of the spectrum is *White v. Harmon*, in which the court denied summary judgment to an officer who allowed a little-trained canine, who had previously bitten someone, to bite a handcuffed suspect. *White v. Harmon,* 65 F.3d 169, 1995 WL 51886 at *3 (6th Cir. 1995) (Table).

In contrast to the facts in *Robinette* and *Matthews,* the events in the present cases occurred in areas unlikely to expose police to ambush and the suspects were not believed to be a threat to anyone at the time the canine unit was called in. Although officers believed that Gemperline may have been a threat to herself, no weapons were found on her person and officers believed she might still be handcuffed. Clark also failed to give warnings to either of the suspects prior to Spike biting them. Even more important to this case is the question of whether or not Spike was properly trained. In both instances, Spike attacked the suspects without warning or a command from Clark.

While the facts in the present case are not as extreme as in *White*, the facts are sufficiently analogous. Clark allowed a "bite and hold" dog, whose training was questionable, to attack two suspects who were not actively fleeing and who, because of proximity, showed no ability to evade police custody.

In light of Sixth Circuit case law, there is ample evidence to suggest that Clark acted contrary to clearly established law when he used an inadequately trained canine, without warning, to apprehend two suspects who were not fleeing.

**B. Supervisory Liability- Chief Kruithoff**

Chief Kruithoff argues that he is entitled to qualified immunity in his supervisory capacity, although the district court determined that a question of fact existed which prevented it from granting summary judgment on this issue.

Before delving into Chief Kruithoff's supervisory liability, we must first determine if we have jurisdiction to address this particular issue on appeal. "A district court's denial of qualified immunity is an appealable final decision under 28 U.S.C. § 1291, but only to the extent that it turns on an issue of law." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 333 (6th Cir. 2010). Therefore, ordinarily, we would lack jurisdiction to hear a defendant's appeal of a denial of qualified immunity that only raises questions of fact. *See Berryman v. Rieger,* 150 F.3d 561, 563 (6th Cir. 1998). However, "[i]f... aside from the impermissible arguments regarding disputes of fact, the defendant also raises the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law, then there is an issue over which this court has jurisdiction." *Kennedy,* 595 F.3d at 334 (quoting *Estate of Carter v. City of Detroit,* 408 F.3d 305, 310 (6th Cir. 2005)).

For this reason, we find that we have jurisdiction to review the claim, but only to determine if, based on the facts as alleged by Plaintiffs, Chief Kruithoff violated Plaintiffs' clearly established constitutional rights.

A supervisor is not liable pursuant to § 1983 for failing to train unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)). "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or

knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (quoting *Hays,* 668 F.2d at 874).

Although Kruithoff was not actively involved in the incidents involving Spike, a causal connection between his acts and omissions and the alleged constitutional injuries is suggested by the record. Chief Kruithoff allowed Spike in the field even after his training had lapsed. He never required appropriate supervision of the canine unit and essentially allowed it to run itself. He failed to establish and publish an official K-9 unit policy, and he was seemingly oblivious to the increasing frequency of dog-bite incidents involving Spike. Furthermore, Chief Kruithoff ignored Clark's many complaints regarding his need to keep Spike up to date on his training. Thus, Chief Kruithoff's apparent indifference to maintaining a properly functioning K-9 unit could be reasonably expected to give rise to just the sort of injuries that occured. The district court correctly determined that the disputed facts preclude granting summary judgment.

## C. Municipal Liability-City of Springboro

The City of Springboro claims that the district court improperly denied its motion for summary judgment because its failure to train the K-9 unit does not amount to a policy of deliberate indifference on behalf of the City towards it inhabitants.

Denials of summary judgment are generally not appealable final orders, but certain denials of summary judgment on grounds of qualified immunity may be appealed. *Mitchell v. Forsyth,* 472 U.S. 511 (1985); *Bomar v. City of Pontiac*, 643 F.3d 458, 461 (6th Cit. 2011). The City, however is not entitled to invoke the defense of qualified immunity and therefore has no grounds to seek an interlocutory appeal of the district court's denial of its motion for summary judgment. *Floyd v. City of Detroit,* 518 F.3d 398, 410 (6th Cir. 2008). Therefore, we lack jurisdiction to entertain the City's appeal.[3]

---

[3]The dissent suggests that this court should assume jurisdiction over the matter pursuant to the doctrine of pendent appellate jurisdiction. The high threshold necessary to assume pendent jurisdiction, however, the "inextricably intertwined standard," is not met here. We have previously held that the inextricably intertwined requirement "is not meant to be loosely applied as a matter of discretion" and is satisfied "only if the resolution of the properly appealable issue 'necessarily and unavoidably' decides the

**D. Ohio Law Claims**

Clark argues that he is entitled to immunity on Campbell's and Gemperline's state law claims based on the provisions of Ohio Revised Code § 2744.03(A)(6). This section provides immunity to employees of political subdivisions of Ohio except where (a) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) the employee's acts or omission were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed upon the employee by a section of the Revised Code.

Based upon the facts presented, a jury could reasonably conclude that Clark acted in bad faith or in a wanton or reckless manner. According to Campbell, Clark made eye contact with him prior to letting Spike bite him as he lay on the ground with his hands out to his side. After Gemperline escaped police custody, Clark threatened to give her a "nice rude awakening" that was not "gonna feel very good." Although Clark argues that he never made the first statement, he admits making the second statement. When viewing these facts in a light most favorable to the Plaintiffs, this information suggests that Clark acted with a malicious purpose when he used Spike to track them. Therefore, the district court properly denied summary judgment as it relates to these claims.

### III.

For the above-stated reasons, we affirm the district court's denial of summary judgment as to the officers and dismiss the City's appeal for lack of jurisdiction.

---

nonappealable issue." *Turi v. Main St. Adoption Services, LLP*, 633 F.3d 496, 502-03 (6th Cir. 2011). We have also assumed pendent jurisdiction where the nonappealable issue is "necessary to ensure meaningful review" of the appealable one. *Archie v. Lanier,* 95 F.3d 438, 443 (6th Cir. 1996) (citing *Swint v. Chambers County Comm'n*, 514 U.S. 35, 51 (1995)). The issues of qualified immunity and municipal liability involve wholly distinct sets of facts and legal standards. Resolving the latter issue here is not necessary nor beneficial to the meaningful review of the former.

---

**CONCURRING IN PART/DISSENTING IN PART**

---

McKEAGUE, Circuit Judge, concurring in part and dissenting in part. I concur in the holding that defendant Officer Nick Clark is not entitled to qualified immunity in relation to plaintiffs' § 1983 excessive force claims. *See* Part II.A, *supra.* I also concur in the holding that Officer Clark is not entitled to immunity in relation to plaintiffs' state law claims for assault and battery. *See* Part II.D, *supra.* I disagree with the conclusion that Police Chief Jeffrey Kruithoff is not entitled to qualified immunity in relation to plaintiffs' claim that he is individually liable for Clark's use of excessive force on a theory of supervisory failure-to-train liability. *See* Part II.B, *supra.* I also disagree with the dismissal of the City of Springboro's appeal. *See* Part II.C, *supra.*

**I**

To understand the grounds for my disagreement, it is important to recognize why, specifically, defendant Clark is exposed to individual liability for using excessive force in apprehending each of the plaintiffs. Each of the two plaintiffs sustained fairly significant leg injuries as a result of police dog "Spike's" assistance in apprehending them after they fled from officers of the Springboro Police Department. Two features that immediately stand out are the facts that both victims were relatively innocent and harmless, and Spike's history of service with the Springboro Police Department is marked by training and certification deficiencies. Plaintiff Samuel Campbell is a young man who drew unwanted police attention when he made too much noise in the early morning hours trying to return his girlfriend's keys after a night out at the bar. He exercised poor judgment when he decided to hide in the darkness from the investigating police officers. Chelsie Gemperline, too, was a victim of her own indiscretions. Eighteen years old, she was caught by police at an underage drinking party. When she resisted their authority, she was handcuffed and placed under arrest in a patrol car. And when she managed to slither out of the cuffs and through the window of the patrol car, she became an "escapee-fugitive," a putative felon. In each apprehension, Spike

discovered the suspect in the darkness while leashed to his handler, Officer Clark, and reacted to discovery of each suspect, not by barking, but by biting. The resultant injuries are certainly regrettable and seemingly avoidable. Yet, there is little evidence of a causal connection between Spike's training deficiencies and plaintiffs' injuries.

In evaluating whether the record sufficiently shows that Clark's conduct was objectively unreasonable, thus forfeiting his entitlement to qualified immunity, it is helpful to first identify what is not at issue. First, there appears to be no dispute about the fact that Spike performed as Clark knew Spike had been trained to perform. Second, despite evidence that Spike's certification was not always timely renewed and his bi-weekly training requirements were not always met, there is little indication that any such deficiencies contributed to plaintiffs' injuries. Despite evidence that Spike should have been trained to assist as a "bark and hold" dog, rather than as a "bite and hold" dog, there is little evidence that Clark's use of Spike in a fugitive tracking situation to help apprehend either Campbell or Gemperline was unreasonable *per se* under the circumstances. Nor is there evidence that Clark necessarily breached any duty by failing to give verbal warnings as he continued each search with Spike or that such failure proximately caused either suspect's injuries.

The real question about the objective reasonableness of the force used is whether, when Spike first identified and "engaged" each suspect, Clark, who had worked with Spike for over two years and knew his training and propensities, acted unreasonably in the manner he called Spike off. And on this question, there are genuine issues of fact in relation to both plaintiffs' claims that preclude awarding Clark summary judgment based on qualified immunity. In relation to Campbell—even accepting that the officers did not know what if any offense the suspect had committed or whether he posed a danger—there are disputes about (1) whether Clark saw Campbell before Spike did and unnecessarily allowed Spike to engage Campbell in the first place; and (2) whether Clark unreasonably delayed in calling Spike off only after he had repeatedly bitten the unarmed Campbell for 30-45 seconds. In relation to Gemperline, who Clark knew posed no danger, there is a dispute about whether Clark acted unreasonably in using the

"choke-off" method to call Spike off, instead of using a verbal command (as he had done with Campbell), which may have exacerbated Gemperline's injuries.

In both cases, as the majority recognizes, Clark's conduct, as evidenced by the record facts viewed in the light most favorable to plaintiffs, is evaluated with reference to the factors outlined in *Graham v. Connor*, 490 U.S. 386, 396 (1989): (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. This general standard, though not susceptible of precise definition or mechanical application, was clearly established at the time of these arrests. And in relation to both plaintiffs, all three factors militate in favor of finding that once Spike discovered and engaged the suspect, minimal force was needed to subdue the suspect. In other words, the force applied by Spike should have been withdrawn as soon as reasonably possible. And in both cases, there is factual support for the proposition that Clark did not call Spike off as soon as reasonably possible or in the manner reasonably expected to minimize unnecessary injury. Viewing the record in the light most favorable to plaintiffs, Clark's conduct was not objectively reasonable, but was marked by malice or incompetence. *See Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986) (qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'")).

Clark insists that he is nonetheless entitled to qualified immunity because the unreasonableness of his use of a police dog in these circumstances had not been clearly established by the case law in a particularized sense. The district court and the majority have endeavored to compare the instant canine-attack scenarios with those deemed to have amounted to excessive force in the existing case law. Yet, every fact situation is necessarily unique and arguably distinguishable. Still, considering the apparent harmlessness of each of these plaintiffs and the seriousness of the injuries sustained, if the facts show that Clark, knowing Spike's propensities, deliberately allowed Spike to continue his attack on Campbell or Gemperline unnecessarily, he can hardly be heard

to argue that a reasonably competent officer would not have known that his conduct was unlawful.

Hence, I concur in the affirmance of the district court's denial of qualified immunity to defendant Clark.  As I view the record, however, Clark's exposure to suit and liability is due to evidence that he unreasonably abused his discretionary authority *at the time* Spike engaged each suspect, by not calling Spike off as quickly as reasonably possible.  Clark's exposure to liability is not due to his failure to ensure Spike received timely training and certification; is not due to his decision to deploy Spike in the first place during either incident; and is not due to his failure to give verbal warnings during the searches.  This determination is consistent with recognition that the excessive-force assessment is based on a "segmented analysis" of the totality of the circumstances facing Clark at the time he made his split-second judgments in response to Spike's engagement of the suspects.  *See Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009).  Because it is the reasonableness of each "seizure" that is the issue, not the reasonableness of Clark's conduct in time segments leading up to the seizure, deficiencies in Spike's training and Clark's failure to give verbal warnings are largely beside the point.  It follows that such considerations are immaterial in evaluating the excessiveness of the force employed by Clark.  Yet, the majority's reliance on these considerations served to confuse its analysis of the claims against Police Chief Jeffrey Kruithoff and the City of Springboro.

## II

Neither the City nor Chief Kruithoff can be held liable for Clark's conduct on a theory of *respondeat superior*.  *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008); *Miller v. Calhoun County*, 408 F.3d 803, 817, n.3 (6th Cir. 2005).  The City may be held liable under § 1983 if it maintained a policy or custom that caused the violation of plaintiffs' rights.  *See Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).  "One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision."  *Id.*  (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)).  The City can be held liable under plaintiffs' failure-

to-train theory if plaintiffs' injuries can be attributed to the City's failure to adequately train Spike *and* this failure amounted to "deliberate indifference" to the rights of members of the public. *See City of Canton*, 489 U.S. at 388. Specifically, plaintiffs must show three elements: (1) that Spike's training was inadequate to prepare him for the tasks he was expected to perform; (2) that the inadequacy persisted due to the City's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused plaintiffs' injuries. *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008).

In *Plinton*, the court identified two ways of demonstrating the second element, deliberate indifference. First, plaintiffs could show deliberate indifference through evidence of prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it. *Id.* (citing *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). Alternatively, plaintiffs could show deliberate indifference through evidence of a single violation of federal rights, accompanied by a showing that the City had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation. *Id.* (citing *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)). Here, plaintiffs appear to rely on the second alternative, implicitly arguing that the City failed to improve Spike's training even though the violation of Gemperline's rights had become foreseeable by virtue of Campbell's experience one year earlier. However, the Campbell incident has yet to be shown to have resulted in a violation of Campbell's constitutional rights. Until such a determination is made, the City cannot be deemed to have been placed on notice of an "obvious" need to improve training based on that single incident. Moreover, "'[d]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. —, 131 S.Ct. 1350, 1360 (2011) (quoting *Bryan County*, 520 U.S. at 410). If the need for more or different training is so obvious that the City policymaker, i.e., Chief Kruithoff, is shown to have been deliberately indifferent to the need, then the City may be deemed to have had a policy of deliberate indifference. *Id.*; *Miller*, 408 F.3d at 815-16. However, mere allegations that Spike was

improperly trained or that an injury could have been avoided with better training are insufficient to make out deliberate indifference. *Id.* at 816.

Further, whereas the City's liability may be premised on its policymaker's deliberate indifference, Kruithoff cannot be held liable in his individual capacity for failing to supervise  unless he "either encouraged the *specific* incident of misconduct or in some other way directly participated in it." *Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).  To hold Kruithoff liable in his individual capacity for injuries shown to be caused by deficiencies in Spike's training or officers' training, plaintiffs must show that Kruithoff "at least implicitly authorized, approved, or knowingly acquiesced" in the violations and injuries sustained by plaintiffs Campbell and Gemperline.  *Id.*  Plaintiffs have neither alleged nor presented any evidence to support a finding of Kruithoff's personal involvement in these incidents.

The majority purports to apply the correct legal standard to plaintiff's failure-to-train claim against Kruithoff.  Further, the majority acknowledges that "Kruithoff was not actively involved in the incidents involving Spike."  It follows that Kruithoff is entitled to qualified immunity.  Yet, the majority affirms the denial of qualified immunity based on evidence of Kruithoff's indifference to the need for better training of the canine unit.

This determination that Kruithoff is exposed to liability in his individual capacity for his alleged failure to adequately train or supervise the canine unit "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Phillips*, 534 F.3d at 543; *see also Miller*, 408 F.3d at 817 n.3 (absent evidence of personal involvement in the underlying misconduct, failure-to-train claims against individual defendants are properly deemed brought against them in their official capacities, to be treated as claims against the municipality).  To the extent plaintiffs have adduced evidence supporting findings that Kruithoff was a City policymaker on matters of training and was so deliberately indifferent to the need for more comprehensive training as to render the training deficiency a matter of *de facto* City policy, he would

be liable, if at all, in his *official* capacity, i.e., rendering the City liable.    *See Scott v. Clay County, Tenn.*, 205 F.3d 867, 879 n.21 (6th Cir. 2000).

Thus, for lack of evidence of Kruithoff's personal involvement in either of these particular incidents, it is clear that he should have been granted summary judgment based on qualified immunity—notwithstanding his responsibility, as Chief and City policymaker, for deficiencies in Spike's and/or officers' training.

The City of Springboro, on the other hand, may be held liable for a policy of deliberate indifference to obvious inadequacies in training or supervision. Further, as the majority recognizes, the City may not assert qualified immunity in defense of a § 1983 claim. In fact, the majority uses this fact to justify its refusal to consider the City's appeal. To be sure, the denial of the City's motion for summary judgment is an interlocutory order that would not ordinarily be subject to immediate review under the collateral order doctrine. We have discretion, however, to exercise pendent appellate jurisdiction over issues not independently appealable if those issues are "inextricably intertwined" with matters properly before us. *Turi v. Main Street Adoption Servs., LLP*, 633 F.3d 496, 502-03 (6th Cir. 2011). Considering the manifestly close relationship between plaintiffs' theories of liability against Clark, Kruithoff and the City, the exercise of pendent appellate jurisdiction over the City's appeal would certainly be appropriate in this case.

In evaluating the plaintiffs' failure-to-train claim against the City, the district court correctly relied on the standard set forth in *City of Canton*, 489 U.S. at 390. The court thus nominally recognized that the City's failure to keep up with Spike's training requirements had to (1) amount to a policy of deliberate indifference to an obvious deficiency that could foreseeably result in violation of citizens' constitutional rights, and (2) actually cause plaintiffs' injuries. The district court found that these two requirements were adequately met even though the record contains no history of prior constitutional violations and fails to substantiate a causal connection between the City's failure to keep Spike's training current and either plaintiff's injuries. These defects in the district court's analysis are particularly glaring when the real basis for Clark's

exposure to liability is kept in focus—i.e., *Clark's* failure to respond to Spike's engagement of each victim in an objectively reasonable manner under the totality of the circumstances.  In other words, there is no causal link in the district court's analysis between the City's failure to keep up with Spike's training and Clark's malevolent or incompetent failure to call Spike off in a reasonable manner.

Thus although the City can be held liable for a policy of deliberate indifference to obvious inadequacies in training or supervision, the record falls short of establishing a sufficient history of canine-unit-related constitutional violations to put the City on notice of obvious inadequacies.  Further, the failure-to-train theory against the City suffers from a lack of evidence causally linking any deficiency in training—whether training of Spike or of Clark—to the injuries sustained by plaintiffs.  The evidence supporting plaintiffs' failure-to-train theory of liability against the City for Clark's use of excessive force is no more than a mere scintilla, insufficient to forestall summary judgment.  Accordingly, in my opinion, the ruling denying summary judgment to the City of Springboro should also be reversed.