BERNICE BOUIE DONALD,
dissenting.
Accepting as true the facts presented by Plaintiff, as we must when faced with a motion for summary judgment, I believe that there remain material issues of fact as to whether Jackson actively resisted and whether the Defendants’ actions were reasonable. I would reverse the district court’s grant of summary judgment as to the excessive force claim, and remand the case for further proceedings. I respectfully dissent.
I.
Qualified immunity shields officers and officials from civil liability only if their conduct “does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified-immunity determinations present two questions: (1) whether the officer violated the claimant’s constitutional rights; and (2) whether that right was clearly established at the time of the incident. Estate of Carter v. City of Detroit, 408 F.3d 305, 310-11 (6th Cir. 2005). Although the two questions are oftentimes conflated due to frequently overlapping analyses, this Court has noted the importance of analyzing them separately. See Hagans v. Franklin Cty. Sheriff’s Office, 695 F.3d 505, 508-09 (6th Cir. 2012) (explaining that if a court does not carefully define the right, it risks collapsing the two qualified-immunity inquiries into one, and' permits the constitutional-violation inquiry to always answer the clearly established inquiry). As the majority correctly notes, *310 the Fourth Amendment clearly establishes the right to be free from excessive force. What is less clear is whether an individual, who becomes incapacitated by taser-in-duced effects and subdued, has a constitutional right to be free from subsequent tasings; and if so, whether that right was clearly established at the time of this incident.
A. Constitutional Violation
I agree with the majority that the major question presented in this case is whether Jackson actively resisted arrest. Where we part ways is with the finding that the record conclusively shows that Defendants’ continuous tasing of an already-incapacitated and pinned-down suspect was a reasonable response to the resistance they perceived.
Plaintiff points to expert testimony and contends that Jackson did not actively resist arrest but only failed to present his hands for handcuffing or follow Defendants’ orders due to taser-induced effects. (,See Appellant’s Br. 9-10.) Alleging differently, Defendants compare Jackson’s actions to the resistance of claimants in cases in which' this Court has found qualified immunity, among them Hagans, 695 F.3d at 509 and Rudlaff v. Gillispie, 791 F.3d 638, 641 (6th Cir. 2015). I believe that both of these cases present sufficiently different circumstances, and analyze them in turn.
In Hagans, as soon as the officer arrived at the scene, the suspect began running toward the officer. 695 F.3d at 507. Despite being ordered to stop, the suspect continued running. Id. He then bolted for the backyard. Id. The officer chased after him and shot him with pepper spray on his backside. Id. He ran to the officer’s cruiser and began yanking on the locked driver’s side door handle, refusing to obey the officer’s commands to stop, which prompted the officer to grab him by the waist and wrestle him to the pavement to try to subdue him. Id. The suspect refused to be handcuffed and locked his arms tightly under his body, kicking his feet and continuing to scream. Id. While two officers struggled with the suspect on the ground, a third officer approached, and seeing the suspect actively resisting arrest, unhol-stered his taser, applied the taser in drive-stun mode, pressing the taser directly against the suspect’s upper back. Id. Eventually, they secured the suspect’s wrists with handcuffs. Id.
In Rudlaff, the incident in question began when the officer stopped the suspect during a traffic stop. 791 F.3d at 640. The officer informed the suspect through his open window that he was under arrest for driving with a suspended license. Id. The officer then opened the driver’s side door and told the suspect to get out. Id. According to the officer; the suspect appeared “highly agitated” and was “swearing” in response to the officer’s request, but voluntarily exited the truck. Id. The officer instructed the suspect to place his hands on the truck but the suspect refused to comply. Id. The officer then grabbed the suspect’s right arm and tried to move it onto the truck. Id. The suspect swung his arm back in the officer’s direction, admittedly trying to “prevent [the officer] from handcuffing” him. Id. The officer then succeeded in getting the suspect to place both his hands on the truck and attempted to grab his left arm to place it in handcuffs. Id. The suspect swung his arms again in the officer’s direction to resist being handcuffed, which prompted the officer to command twice, “give me the hands.” Id. The suspect refused. Id. The officer then performed a knee strike on the suspect, but the knee strike did not subdue the suspect. Id. The officer warned, “relax, or else you’re gonna [sic] get tasered.” Id. Moments later, the officer tased him. Id. He *311 immediately fell to the ground and the officers handcuffed him. Id.
What happened in Hagans and in Rud-laff falls short of capturing the kind of resistance that occurred in this ease. Although Hagans and Rudlaff involved resisting arrestees, Jackson’s resistance tells a different tale. Jackson was never told that he was under arrest. (R. 28-3, PageID 392-99.) Jackson stopped running when Officer Urban warned him that he was going to tase him. (Id. at 393, 109 S.Ct. 1865.) Jackson did not resist the officers until after he had become completely unconscious, unresponsive, and exhibited signs of extreme physiological distress. (Id. at 394, 109 S.Ct. 1865.)
Defendants describe how Jackson resisted attempts by four different Washtenaw County Sheriffs Deputies to arrest and handcuff him. (Appellee’s Br. 5-9.) What they fail to note, however, is the point at which Jackson began resisting: after he had been tased. After he had become incapacitated. After his limbs had become too stiff and rigid to move. And after he had at least two officers on top of him, jerking his flailing arms back behind his back. (Id.)
Considering the distinction between active and passive resistance, it is obvious that an individual who cannot control his or her body during a tasing episode is not capable of active resistance. See Goodwin v. City of Painesville, 781 F.3d 314, 324 (6th Cir. 2015). Although our case law does not dictate how police should react in every circumstance, our case law does not espouse a rationale of heedlessly tasing someone until they stop kicking and convulsing, especially once they pose no real threat to the officers’ safety. The facts of this case, including Jackson’s condition and the officers’ actions, raise a genuine issue of fact for a jury.
In Goodimn, for instance, we found that although the suspect failed to present his arms for handcuffing as officers instructed him, there was ample evidence in the record to support his claim that he did not have enough control of his body to comply during the tasing episode. Id. In fact, when being tased, the suspect landed on his back and started to bring his arms up under his chin in an apparent involuntary manner, and then he began convulsing uncontrollably while the officers incessantly told him to “quit resisting.” Id. at 319. In his wife’s deposition, she testified that he was not resisting but convulsing. Id. at 324. To further support his account, the suspect submitted the following witness testimony describing his convulsions: “Foam was coming out of his mouth.... He couldn’t put his hands behind his back because they shocked him so bad.” Id. Viewing these facts in the light most favorable to the suspect in that case, we concluded in Goodwin that the suspect’s taser-induced convulsions amounted to passive resistance, which by no means warranted the force used against him. Id.
Consider, also, Austin v. Redford Township Police Department, where we found that although the suspect did not immediately comply with the officer’s commands, he was not actively resisting because he was too disoriented from at least two prior taser deployments and one police dog attack to properly obey officers’ orders. 690 F.3d 490, 498 (6th Cir. 2012). The suspect had already been placed in the patrol car leaving only his feet outside the car. Id. He was experiencing and complaining of shortness of breath, yet, the officers tased him a third time alleging that he actively resisted them command to place his feet inside the patrol car. Id. In that case, we noted that even without precise knowledge that the use of a taser would be a violation of a constitutional right, the officer should have known based on analogous cases that his actions to tase a subdued, disoriented *312 person was excessive, and thus, unreasonable. Id.
Lastly, I point to this Court’s decision in Shreve v. Jessamine County Fiscal Court, in which the suspect became disoriented and incapacitated as a result of being pepper sprayed by officers. 453 F.3d 681, 687 (6th Cir. 2006). When the suspect failed to present her hands for handcuffing after being pepper sprayed, the officers continued to beat her with a stick ten to twelve times while she was on the ground and “out of it.” Id. Under the objective reasonableness standard, we found that the beating, which the suspect suffered after becoming incapacitated and subdued by pepper spray was not reasonable, but was rather a violation of a clearly established right to be free from excessive force. Id.
Turning back to the facts of this case, a jury could conclude that Jackson’s uncontrollable convulsions, as described by Defendants, caused him to only passively resist the officers after he was tased. This case does not appear to be the type of case that lends itself to a summary review of a police incident report to yield a one-sided conclusion as to whether a suspect actively resisted arrest. The fact that Jackson was suffering from taser-induced effects at the moment he started resisting is telling as to his volitional capacity to resist, which, as Plaintiff argues, creates a question of fact for a jury.
Plaintiff submitted a report from law enforcement expert, Ernest Burwell, who ultimately opined the extent to which Jackson may have resisted out of a mere struggle for his life and not one against the officers. (R. 34, PageID 779-80.) In the report, he described how Jackson most likely lacked control of his body movement and suffered from difficulty in breathing after being tased. (Id.) Burwell stated that “depending on its method of use, the taser gun has the capacity to overcome the central nervous system, meaning that it can cause the human body to become rigid and inflexible.” (R. 34, PageID 779.) He described how a person being tased can react in the following various ways: falling immediately to the ground, yelling, screaming, being silent, freezing in place during the discharge of the current, kicking, suffering from eye injury, suffering from any secondary injuries caused by falling, temporary tingling, and lacking memory or sensation of pain. (Id. ) Noting the difference between probe-mode and drive stun-mode, he opined that, contrary to the police report, Jackson may have been tased at least three times in probe-mode, which is the more painful mode. (Id. at 775.)
Hearing this evidence, a jury could conclude that, at the time of each deployment of the taser gun, Jackson had already become subdued. Also, if we are to accept Plaintiffs version of the facts, including her expert report, as true, we must presume that any resistance was taser-in-duced. To be clear, we may allow for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving as to the amount of force necessary in a particular situation. Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). But just like in Goodwin, it is not clear to me that Jackson’s pulling away of his arms from the officers’ grasp and kicking was not due to involuntary convulsions from having been tased three times prior.
As the majority notes, we do not have testimony from decedent Jackson describing, in his own words, which movements he could and could not control as we have had in previous cases. Regardless, considering the facts of the incident in the light most favorable to Plaintiff, both the expert report and the timing of Jackson’s resistance *313 are sufficient to suggest that Jackson may not have been actively resisting arrest. Therefore, I cannot agree that the interaction at issue follows the typical course of active resistance that would justify multiple tasings.
B. Clearly Established Right
The second question asks whether that right was “clearly established” at the time of the alleged violation. Campbell v. City of Springboro, 700 F.3d 779, 786 (6th Cir. 2012). To be a clearly established right, “[t]he contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Wheeler v. City of Lansing, 660 F.3d 931, 938 (6th Cir. 2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). “This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law[,] the unlawfulness must be apparent.” Anderson, 483 U.S. at 640, 107 S.Ct. 3034.
Fourth Amendment jurisprudence makes clear that the right to be free from excessive force even if passive resistance occurs is not a newly discovered right. See Phelps v. Coy, 286 F.3d 295, 301 (6th Cir. 2002) (holding that using force after a suspect has been “incapacitated by mace would be excessive as a matter of law”). This Court’s precedent denouncing the use of excessive force on subdued and involuntarily resisting individuals has dated back to at least 2002. Id.
Therefore, a reasonable officer would have known that repeatedly tasing someone who had already exhibited all the signs of being incapacitated and in distress would violate the right to be free from excessive force. Defendants could not have reasonably believed that their repeated tasings of Jackson, after recognizing Jackson’s dire need for medical assistance and pinning him down, was not wrong. This is not a case where the evidence is so objectively compelling that no reasonable juror could believe Plaintiff. The Plaintiff has presented sufficient evidence for a jury to rationally determine that Defendants used excessive force against Jackson and should be denied qualified immunity.
II.
This case is not as clear-cut as the majority would make it seem. The record viewed in the light most favorable to the non-moving party, Jackson, demonstrates that a genuine issue of material fact exists as to the reasonableness of Defendants’ decision to continuously tase Jackson. For this reason, I respectfully dissent.