Jane DOE, Plaintiff,

v.

CITY OF SAN DIEGO,
et al., Defendants.

Case No. 12–CV–689–MMA–DHB.

United States District Court,
S.D. California.

Signed March 27, 2014.

ed).

Browne Greene, Greene, Broillet & Wheeler LLP, Santa Monica, CA, Linda G. Workman, Joseph Gary Dicks, Dicks and Workman APC, San Diego, CA, Andrew J. Spielberger, Daniel K. Balaban, Balaban & Spielberger LLP, Los Angeles, CA, Holly N. Boyer, Esner, Chang & Boyer, Pasadena, CA, for Plaintiff.

Christina M. Milligan, Keith W. Phillips, Donald F. Shanahan, Office of the City Attorney, Michelle Landis Gearhart, Daley & Heft LLP, San Diego, CA, Mitchell D. Dean, Daley and Heft, Solana Beach, CA, Kevin M. Osterberg, Haight, Brown and Bonesteel, LLP, Riverside, CA, for Defendants.

## ORDER GRANTING SUPERVISOR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 191]

MICHAEL M. ANELLO, District Judge.

This case arises out of the tortious conduct of former San Diego Police Officer

Anthony Arevalos. In response to Arevalos' acts, Plaintiff Jane Doe ("Plaintiff" or "Doe") filed suit against Defendants City of San Diego (the "City"), Arevalos, and nine of Arevalos' past supervisors[1] in the San Diego Police Department (the "Supervisor Defendants"). In the present motion, the Supervisor Defendants seek summary judgment on all of Plaintiff's claims asserted against them. [Doc. No. 191.] Upon consideration of the comprehensive record before the Court, including the written and oral arguments of counsel, the Court **GRANTS** the Supervisor Defendants' motion for summary judgment.

### Background[2]

The facts surrounding the encounter between Jane Doe and Officer Arevalos have been thoroughly recited by this Court in previous orders and need not be repeated here. Instead, the Court focuses its attention on the facts involving the Supervisor Defendants.[3]

Jane Doe was not Anthony Arevalos' only victim. Rather, beginning in the late 1990's, Arevalos was allegedly involved in a number of other sexually-laced incidents. Plaintiff contends that Arevalos' police supervisors intentionally covered up his repeated misconduct, rendering them personally liable for Plaintiff's injuries. Accordingly, Plaintiff's Fourth Amended Complaint asserts fourteen claims against the Supervisor Defendants.[4] Liability for the Supervisor Defendants is primarily premised on four past incidents involving Officer Arevalos, in addition to general details regarding Arevalos' misconduct within the SDPD. The Court will briefly outline the facts related to Arevalos' past misconduct.

### The 5150 Detainee Incident: Defendants Tai, Hollister, and Guevara

The first report of misconduct involving Officer Arevalos occurred in the late 1990's. At that time, Officer Arevalos, along with Officer Francisco Torres, was

1. William Lansdowne David Bejarano, Rudy Tai, Danny Hollister, Kevin Friedman, Victoria Binkerd, Robert Kanaski, Max Verduzco, and Jorge Guevara.

2. The following facts are taken from the Supervisor Defendants' moving papers and Plaintiff's opposition and construed in the light most favorable to Plaintiff. *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir.2007). The facts cited are not reasonably in dispute, except where otherwise noted.

3. The Supervisor Defendants object to Plaintiff's presentation of material facts in dispute, on the basis that Plaintiff has improperly supported her statement of facts by citing to the factual statements set forth by her expert witnesses in their reports rather than citing to facts in the record. The Court agrees that Plaintiff's presentation of the facts is improper. "The law is clear ... that an expert report cannot be used to prove the existence of facts set forth therein." *In re Citric Acid Litigation*, 191 F.3d 1090, 1102 (9th Cir. 1999). Thus, to the extent Plaintiff relies sole-

ly on the expert reports to support her factual statement, the Court **SUSTAINS** Defendants' objection. Moreover, the Court **SUSTAINS** Defendants' objections to Plaintiff's exhibits WW, YY, CCC, DDD, HHH through RRR, UUU, AAAA, CCCC, DDDD, and KKKK. Each of these exhibits either contain inadmissible hearsay, were not properly authenticated or are irrelevant. All evidentiary objections not referenced herein are either overruled, or the evidence in question was not material to the resolution of this motion, rendering the objections moot.

4. The claims asserted against the Supervisor Defendants are identical to those asserted against Arevalos: (1) Sexual Assault; (2) Sexual Battery; (3) False Arrest; (4) False Imprisonment; (5) Violation of Civil Code § 52.1; (6) Violation of Civil Code 51.7; (7) Violation of Civil Code § 52.4; (8) Violation of 42 U.S.C. § 1983; (9) Violation of 42 U.S.C. § 1985; (10) Violation of 42 U.S.C. § 1986; (11) Negligence; (12) Intentional Infliction of Emotional Distress; and (13) Injunctive Relief.

dispatched to a call regarding a young, naked woman dancing at a local park. Officer Torres persuaded the woman to put her clothes on, and the officers placed her in handcuffs for a psychiatric hold pursuant to California Welfare and Institutions Code section 5150.

Officer Torres states that as they were driving to a local hospital, Officer Arevalos encouraged the female to undress again, and that the female said that she would have sex with the officers. Arevalos engaged in and encouraged the sexual banter.

Upon arrival at the hospital, Officer Torres went to get a nurse. Torres claims that when he returned to the patrol car, the detainee was naked again and Torres saw what appeared to be camera flashes. Torres assumed Arevalos was taking pictures of the nude girl. Officer Torres alleges that the girl had Officer Arevalos' police baton inserted into her vagina.

Torres contacted his own supervisor, Defendant Danny Hollister, to report the incident. According to Defendant Hollister, Torres informed him that Arevalos had an inappropriate conversation with the female, had encouraged her to disrobe, and had taken photographs of her. Hollister testified that he did not remember if Torres mentioned anything about Arevalos encouraging the detainee to place his service baton in her vagina.

Defendant Hollister, who was not in Arevalos' chain of command, informed Defendant Rudy Tai, Arevalos' direct supervisor, of Arevalos' behavior. Officer Torres also met with Defendant Tai. There is a dispute over what information Defendant Tai received regarding the incident. Tai denies being told by Torres that Arevalos photographed the detainee or encouraged

her to use his baton in a sexual fashion. Torres claims, however, that he told Tai everything that he had witnessed.

Tai interviewed Arevalos, who admitted to making inappropriate sexual remarks, but characterized them as flirtatious and joking. Tai also informed his commanding officers, Defendant Jorge Guevara and Captain Olias,[5] of the inappropriate remarks by Arevalos. Tai conducted and completed his investigation regarding the allegations, and concluded that Arevalos' conduct was unprofessional.[6] Arevalos was verbally reprimanded and instructed that this type of conduct would not be tolerated in the future. A written reprimand was not issued.

### The Susy S. Incident: Defendant Chief Bejarano

Susy S. contends Arevalos mistreated her during a traffic stop in March or April 2001. While driving a marked police car, Arevalos pulled up next to Ms. S's vehicle, made flirtatious comments to her, and asked her to pull her vehicle over and stop. Ms. S refused to stop and drove towards her home instead; Arevalos followed.

Ms. S contends that she stopped her car in front of her apartment building and Officer Arevalos stopped almost bumper-to-bumper behind her. Ms. S was frightened and began screaming, "What are you doing? Why are you trying to pull me over?" and "Help me." Ms. S claims that when she exited her vehicle, Arevalos grabbed her wrists behind her back and pushed his groin into her buttocks. She claims he also placed his hands on her breasts.

Ms. S contends her husband came outside as she was screaming, and that she began describing the situation to him. Of-

---

5. Since deceased.

6. Plaintiff contends that the investigation by Tai was a "sham."

ficer Arevalos said that she failed to signal for a turn, and he wrote her a citation. Ms. S refused to sign the citation and knocked the ticket book to the ground, but her husband picked it up and told her to sign the citation.

Ms. S claims she called the police department the next day to report Arevalos, and that she met personally with Defendant Chief Bejarano. She also claims that she had a second meeting with Chief Bejarano a few days later. She testified that Chief Bejarano met her in a parking structure near City Hall and told her that "everything was taken care of" and that Arevalos was "going to have consequences." Susy S. told Chief Bejarano that she wanted Arevalos fired.

Ms. S's husband has no recollection of his wife ever telling him that Arevalos touched her. Nor does he recall her telling him that she was going to SDPD to complain about Arevalos' conduct. She told him that she was upset because the officer had tried to pull her over in an alley.

The Supervisor Defendants contend Susy S.'s claim is not supported by the record, and that it is a fictionalized account such that no reasonable jury could believe it. For instance, Arevalos was stationed in the Southern Division in 2001, and the alleged incident with Susy S. occurred within the parameters of the Western Division. Also, it was not the practice or custom of intake officers to contact Chief Bejarano and advise him that a citizen was filing a complaint regarding an officer's conduct. Nor was it Bejarano's practice to meet personally with citizens who complained of officer misconduct. Bejarano has no recollection of ever having an appointment to meet with Susy S. during his tenure with the SDPD.

### The MP Incident: Defendants Verduzco and Binkerd

In July 2007, sixteen-year-old MP, wearing a bathing suit covered by a top, was stopped while driving by Officer Arevalos. Arevalos told her that her license plate tags were about to expire, but MP responded that the tags were valid until October or December. Arevalos told her to exit her vehicle so she could look at the tags. Once behind the vehicle, Officer Arevalos told MP to "bend over" to look at the tags. Even though she could see the tags while standing, MP bent over as she was told. Officer Arevalos was standing behind MP as she did so, and MP states that Arevalos was "really weird and uncomfortable." MP immediately drove home and told her father, LP, what had occurred. LP called a friend in the police force, Sergeant Art Bowen, to complain. LP told Bowen that Arevalos had stood behind MP while making her bend over to look at her plainly visible tags. Sergeant Bowen then used the Department's messaging system to contact Arevalos' supervisor, Sergeant Max Verduzco, providing the details of what MP and LP reported.

Later, LP called Sergeant Verduzco directly to report Arevalos' behavior. LP thought Arevalos should be fired. Verduzco told LP that parents in La Jolla cause trouble anytime their kids are pulled over. LP then contacted Verduzco's supervisor, Victoria Binkerd. After speaking with Binkerd, LP decided against filing an official complaint. According to Plaintiff, LP did not pursue the matter further because he did not want to risk damage to his friend Art Bowen's career at the SDPD. Binkerd did not document, investigate, or discipline Officer Arevalos for his conduct.

### The Jane Roe Incident: Defendants Friedman and Kanaski

On February 20, 2010, Jane Roe consumed a significant amount of alcohol be-

fore and after working as an exotic dancer. She attempted to drive herself home, despite her intoxicated state. Roe sideswiped a shopping cart corral and crashed into a flower box outside an office supply store. A security guard took her keys, and called 911 to report the crash. Officer Arevalos was one of several officers that responded to the scene. Roe was visibly upset and agitated. She was put into the back of Arevalos' patrol car and taken to headquarters for a forced blood draw to determine her blood alcohol content. Roe's blood alcohol level was 0.19%.

Thereafter, Arevalos transported Roe to the Las Colinas Women's Detention Center. On the way, Roe claims that Arevalos pulled his vehicle off the road, put blue latex gloves on, shined his flashlight in her face, then shoved his "hand" into her vagina. Arevalos then continued driving to Las Colinas.

Upon arrival at Las Colinas, Roe continued to act wildly. She yelled and screamed insults at Arevalos, and accused him of raping her and putting his hand inside her vagina. A nurse at the jail took Roe's vital signs and told the officers that she could not be admitted because her heart rate was too high. Defendant Friedman, Arevalos' supervisor, was notified of the situation and went directly to Las Colinas. Friedman was able to get Roe to calm down. He listened to Roe's allegations, but did not believe them based upon the nature of the allegations and Roe's intoxicated state. Arevalos then drove Ms. Roe to UCSD Medical Center, with Friedman following.

Roe told the admitting clerk that she had been sexually assaulted. Two officers from Internal Affairs came to the hospital and conducted an interview with Roe and took photographs. Allegedly, Roe requested a rape examination ("SART"), which did not take place until several days later. The results of the SART exam were inconclusive. Two days after the assault, Roe allegedly called the police department and was told there was no record of her making a complaint.

Friedman reported the incident to the Watch Command and Internal Affairs.[7] Two separate investigations into the allegations were conducted. One was criminal, conducted by the Sex Crimes Unit, and one was administrative, conducted by Internal Affairs. Pending the investigations, Arevalos was assigned a desk job and removed from the field. Ultimately, the District Attorney's office declined to proceed with pressing charges because the evidence against Arevalos was insufficient.

On April 7, 2010, Arevalos sent an email to Defendant Kanaski noting the District Attorney's decision of rejection and asking Kanaski when Arevalos could be returned to the field. Defendant Kanaski responded that his "goal was to get [Arevalos] back in the field as quickly as possible. I will not be waiting for the entire investigation to be completed." [Doc. No. 219, Ex. BBBB.]

SDPD Internal Affairs conducted its own separate investigation after the criminal case was rejected by the DA. The Internal Affairs investigation concluded on September 23, 2010, with a finding of not-sustained.[8] Based upon the non-sustained

---

7. Plaintiff contends that Friedman erred by categorizing Roe's sexual assault claim as a Public Service Inquiry ("PSI") rather than a Category I complaint. However, it is undisputed that Friedman reported the incident,

and that two investigations were subsequently performed.

8. Plaintiff states that the conclusion of the Internal Affairs investigation is highly suspect

finding, there was no basis for imposing discipline or changing Arevalos' assignment. He was returned to his prior assignment in the Traffic Division.

Sex Crimes Investigators checked the automatic vehicle location ("AVL") system in Arevalos' vehicle and discovered that there was a time lapse of one-minute and twenty-nine seconds during the time he was transporting Roe where it appeared that Arevalos was stopped in the area of 163 North at Friars Road. Detectives went to that location five days after Roe's arrest and found eight blue latex gloves. Sergeant Friedman confirmed that SDPD officers are issued blue latex gloves as part of their personal protection supplies. The gloves were tested for DNA. Six of the gloves did not match either Roe or Officer Arevalos, and two of the gloves did not contain sufficient DNA to conduct a test.[9] Sergeant Friedman said this information was very disconcerting to him and caused his "jaw to drop."

Neither Friedman nor the Internal Affairs investigator told Arevalos that the AVL system showed his vehicle was parked for one-minute and twenty-nine seconds, nor did they ever confront Arevalos with the fact that blue latex gloves, similar to the gloves issued to SDPD officers, were found at the location where Roe and the AVL indicated that he had stopped.

### Additional Facts Regarding Defendant Friedman's Knowledge of Arevalos' Misconduct

Plaintiff contends there are separate grounds for establishing Defendant Fried-

man's liability. Specifically, Plaintiff cites the following facts:

- Friedman admitted that he knew that Arevalos showed off the driver's license photos of his attractive female arrestees and that Arevalos would sometimes print out DMV photographs from a department computerized system "Cal Photo."

- Friedman stated that he believed that Arevalos would use the department's computers to access social networking sites. Yet, he never confronted Arevalos, counseled or disciplined Arevalos, or contacted Internal Affairs to have Arevalos' computer routinely inspected.

- Friedman stated that Arevalos often boasted about stopping cute girls and because of this, he spent more time supervising Arevalos than the other officers on his squad. Although Friedman stated that Arevalos' boasting was such a concern that he demanded more supervision than any of his other officers, Sergeant Friedman admitted that he never spoke with Arevalos regarding his concerns.

### Defendant Lansdowne's Knowledge of Arevalos' Misconduct

Former SDPD Chief William Lansdowne was appointed to his position in 2003. He was Chief of Police at the time of the Jane Roe incident, and agreed with the Internal Affairs report which found that Roe's allegations against Arevalos could not be sustained. Apart from the Roe incident, Lansdowne was not aware of

---

and a sham. Nonetheless, it is undisputed that the investigation occurred.

9. Plaintiff contends that delays in initiating the investigation seriously undermined the investigation. For instance, due to unwarrant-

ed delays, the DNA material on the blue latex gloves was too old to be accurately tested for genetic material. However, no evidence links Defendant Friedman to the delays or other investigation shortcomings.

any other complaints alleging sexual misconduct against Arevalos.

In March 2007, Arevalos was caught accessing adult porn sites on his computer. Lansdowne received notice of Arevalos' behavior in conjunction with Arevalos' disciplinary transfer from the detective's squad to the traffic division.

## DISCUSSION

Plaintiff's primary cause of action against the Supervisor Defendants arises under 42 U.S.C. § 1983. Plaintiff seeks to impose supervisory liability under § 1983 upon the Supervisor Defendants for their alleged failures to properly investigate, document, and report the past complaints involving Officer Arevalos. The Supervisor Defendants claim summary judgment is appropriate because they are entitled to qualified immunity with respect to Plaintiff's claim under § 1983. For the reasons discussed below, the Court agrees.

### A. Summary Judgment Standard

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of informing the Court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When a party fails to properly address another party's assertions of fact, a court may consider these facts as undisputed. Fed. R.Civ.P. 56(e)(2). If the motion and supporting materials, including facts considered undisputed, show the movant is entitled to summary judgment, the Court may grant the motion. Fed.R.Civ.P. 56(e)(3). Summary judgment is not appropriate if the non-moving party presents evidence from which a reasonable jury could resolve the disputed issue of material fact in his or her favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Barlow v. Ground,* 943 F.2d 1132, 1136 (9th Cir.1991). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

### B. Supervisory Liability Under 42 U.S.C. § 1983

"Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights." *Devereaux v. Abbey,* 263 F.3d 1070, 1074 (9th Cir.2001). "To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Tsao v.*

*Desert Palace, Inc.,* 698 F.3d 1128, 1138 (9th Cir.2012).

Supervisory officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (italics in original). Rather, a plaintiff must establish that each individual "Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* In other words, supervisory officials "cannot be held liable unless they themselves" violated a constitutional right. *Id.* Thus, supervisory liability can be imposed only if (1) the supervisor was personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir.1989).

"The requisite causal connection can be established ... by setting in motion a series of acts by others, or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr v. Baca,* 652 F.3d 1202, 1207–08 (9th Cir.2011) (internal citations omitted). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (citations omitted).

Because supervisory liability is personal liability, an official against whom a claim of supervisory liability is advanced may assert the affirmative defense of qualified immunity. *al-Kidd v. Ashcroft,* 580 F.3d 949, 963–65 (9th Cir.2009) (citation omitted). The doctrine of qualified immunity provides a public official performing a discretionary function immunity in a civil action for damages, provided his or her conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The immunity is "immunity from suit rather than a mere defense to liability[.]" *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

The analysis employed in determining whether a government official is entitled to qualified immunity consists of two questions. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under this inquiry, if there is no constitutional violation no further inquiry is necessary. *Id.*

Second, if a violation of a constitutional right can be found, was the right clearly established? *Id.* Under this inquiry, a defendant may be shielded from liability if his or her "actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727).

When considering qualified immunity, the court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

▮▮▮ Where a plaintiff asserts liability against a supervisory defendant for his or her conduct in connection with a subordinate, for purposes of the qualified immunity analysis, the plaintiff must establish that each individual defendant participated in the violation of a constitutional right. The plaintiff must establish that the subordinate committed a violation of a constitutional right, and that the violation is attributable to the personal conduct of the supervisory defendant. *Poe v. Leonard,* 282 F.3d 123, 133–35 (2nd Cir.2002); *see also al-Kidd,* 580 F.3d at 963–65 (citation omitted). Conduct that violates a constitutional right must be attributable to each individual defendant. *McDade v. West,* 223 F.3d 1135, 1142 (9th Cir.2000).

### C. Section 1983 Analysis

▮▮ The Supervisor Defendants assert that they are entitled to qualified immunity on Jane Doe's Section 1983 claim. "In order to be entitled to qualified immunity, the officers must show that their discretionary conduct did not violate any clearly established rights of which a reasonable person should have known." *Penilla v. City of Huntington Park,* 115 F.3d 707, 709 (9th Cir.1997). Plaintiff contends that her right to be free from police sexual battery is clearly established under the Fourteenth Amendment. The pivotal question, however, is not whether Plaintiff was constitutionally harmed, but whether the Supervisor Defendants are personally liable for the harming. The answer resides within the confines of Section 1983's supervisory liability jurisprudence.

As the Court previously noted, supervisory liability can be imposed only if (1) the supervisor was personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *See Hansen,* 885 F.2d at 646. It is undisputed that the Supervisor Defendants did not personally participate in the sexual assault and battery of Jane Doe. Accordingly, to prevent summary judgment, Doe must produce evidence demonstrating a causal connection between the Supervisor Defendants' conduct and Doe's injury.

The Supervisor Defendants contend that this burden is insurmountable because the requisite causal connection can only be forged by demonstrating repeated failure to act to abate repeated constitutional violations, and it is undisputed that at the time of Doe's injuries each Supervisor Defendant knew of only one prior allegation of sexual misconduct against Officer Arevalos.[10]

Plaintiff disagrees with the Supervisor Defendants' interpretation of supervisory liability requirements. She contends that the requisite culpability for supervisory inaction can be established on the basis of a single incident of subordinate misconduct. [Opp. at 32 (citing *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 567 (1st Cir. 1989)).] Upon review of *Gutierrez–Rodriguez* and the other cases relied on by Plaintiff, however, the Court finds that the limits of supervisory liability are not so unrestrained.

In *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 562 (1st Cir.1989), four police officers shot at Carlos Gutierrez as he was driving away from a traffic stop. One bullet struck Gutierrez in the back, causing him to lose control of the vehicle. Gutierrez suffered extensive and permanent injuries as a result of his gunshot wound.

---

10. Defendants Friedman and Lansdowne also had knowledge of miscellaneous misconduct engaged in by Officer Arevalos. However, as discussed below, this misconduct did not rise to the level of a constitutional violation.

Gutierrez sued the four officers who were at the scene under Section 1983, and also brought suit against Domingo Alvarez, the Director of the Drugs and Narcotics Division and Desiderio Cartagena, the Police Superintendent. The court permitted supervisory liability to attach to both Alvarez and Cartagena because the supervisors' positions, responsibilities, and conduct not only demonstrated reckless or callous indifference to the constitutional rights of others, but was also affirmatively linked to the officers' misconduct. *Id.* at 562.

Among other things, Alvarez was aware that Officer Soto, the officer in charge of the squad, had a reputation for having a violent character in mistreating citizens. Alvarez had authority to assign Soto to a desk job, but continued to send Soto out as a squad supervisor despite a number of complaints that had been filed about Soto. Alvarez admitted that he was aware that Soto had been the subject of ten citizen complaints charging abuse during his tenure with the division. Alvarez also knew that Soto had been suspended for five days only five months before the Gutierrez incident. Then, Soto, as a round supervisor, stood by and pointed a gun while those under his command beat up a civilian doctor.

Superintendent Cartagena was ultimately responsible for the supervision of all of the officers under his command. Every complaint filed against an officer went to Cartagena for disposition. He made the final decision as to whether an officer was guilty or not guilty. Soto was the subject of at least thirteen separate complaints filed within four years of the Gutierrez incident. Cartagena personally signed letters dismissing the charges against Soto in twelve of the thirteen complaint cases. Despite his power to do so, Cartagena emphatically refused to consider an officer's past history of complaints when re-viewing that officer's conduct. Plaintiff's expert stated that the number of complaints levied against Soto alone should have signaled that he needed immediate attention.

On these facts, the First Circuit concluded that both deliberate indifference and a causal link between the supervisors' inaction and Gutierrez's injuries existed. Importantly, supervisory liability in *Gutierrez–Rodriguez* was not premised on knowledge of one past incident of misconduct, but, rather, a long history of past complaints and violence.

In *Campbell v. City of Springboro, Ohio*, 700 F.3d 779 (6th Cir.2012), several plaintiffs attacked by the same police dog brought a Section 1983 action against the canine handler, the chief of police, and the city of Springboro, Ohio. In relevant part, the Sixth Circuit concluded that Police Chief Jeffrey Kruithoff was not entitled to qualified immunity because a causal connection between his acts and the alleged constitutional injuries was suggested by the record. Specifically, Chief Kruithoff allowed a police dog, Spike, in the field after his training had lapsed, and after ignoring many complaints regarding the need to keep Spike up to date on his training. Moreover, Chief Kruithoff "never required appropriate supervision of the canine unit and essentially allowed it to run itself. He failed to establish and publish an official K–9 unit policy, and he was seemingly oblivious to the increasing frequency of dog-bite incidents involving Spike." *Id.* at 790. Accordingly, the Sixth Circuit concluded that Chief Kruithoff's apparent indifference to maintaining a properly functioning K–9 unit could be reasonably expected to give rise to just the sort of injuries that occurred. *Id.* Significantly, however, *Campbell* did not permit supervisory liability based on knowledge of one past incident of subordinate miscon-

duct. Rather, liability was established based on a showing of "many complaints," and "frequent dog-bite incidents" involving the subject dog. *Campbell,* 700 F.3d at 790.

Plaintiff further relies on *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991), which stands for the proposition that, in limited circumstances, a supervisor's subsequent "ratification" of another's conduct can form the basis for supervisory liability. In *Larez,* the Ninth Circuit held there was no plain error in a jury verdict finding Los Angeles Chief of Police Daryl Gates liable for his officers' use of excessive force. *See Larez,* 946 F.2d at 646. Larez presented evidence that Gates personally dismissed his excessive force complaint against the officers who searched Larez's house. *Id.* at 635. He also presented an expert witness who testified that Chief Gates should have disciplined the officers and established new procedures to avoid future similar incidents. *Id.* at 636. The expert further testified that, based on a two-year comparative study he had conducted, Los Angeles police officers almost never received discipline as a result of citizens complaints. *Id. Larez* held that on this evidence the jury could have found Chief Gates "condoned, ratified, and encouraged excessive use of force" among the officers he supervised, and thereby caused Larez's constitutional violations. *Id.* at 646. Here, Plaintiff is not proceeding on a ratification theory, and thus *Larez* is inapplicable.

Plaintiff also cites *Marchese v. Lucas,* 758 F.2d 181, 188–89 (6th Cir.1985), a case in which the Sixth Circuit held that failing to investigate and impose discipline for the events that caused the plaintiff's injuries could lead to municipal liability under *Mo-*

*nell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Marchese* is not relevant in this present motion, where the question is whether *individual* supervisory liability—not municipal liability—should attach.[11]

Upon review of the case law—cited by Plaintiff or otherwise—the Court cannot find any case which imposes personal liability on a supervisor for having knowledge of a single prior act of misconduct on the part of a subordinate. *Ontha v. Rutherford County, Tenn.,* 222 Fed.Appx. 498 (6th Cir.2007),[12] has been cited for the proposition that supervisory liability can be imposed based on a truly egregious single incident. *See Dillingham v. Millsaps,* 809 F.Supp.2d 820 (E.D.Tenn.2011). *Ontha* states, however, that "[supervisory] liability attaches only if a constitutional violation is part of a pattern of misconduct, or where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to occur." *Ontha,* 222 Fed.Appx. at 504. "Only in such circumstances can it be said that a supervisor's liability rests upon 'active unconstitutional behavior,' as opposed to 'a mere failure to act.'" *Id.* (quoting *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir.1999)). Here, Plaintiff does not proceed on a theory that the Supervisor Defendants utterly failed to train Arevalos; thus, the limited exception espoused by *Ontha* is inapplicable here.

Upon review of the case law, the Court concludes that, for cases involving supervisory inaction following subordinate misconduct, a supervisor must have knowledge of pervasive and widespread conduct posing an unreasonable risk of constitu-

---

**11.** The same applies to *Brandon v. Allen,* 645 F.Supp. 1261 (W.D.Tenn.1986).

**12.** Plaintiff does not cite *Ontha* in her brief.

tional injury before supervisory liability can attach. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994); *Starr*, 652 F.3d at 1207–08 ("The requisite causal connection can be established ... by setting in motion a *series of acts* by others, or by knowingly refus[ing] to terminate a *series of acts* by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury.") (emphasis added); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir.2003) ("The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.") (internal formatting omitted).

Both parties favorably cite the Fourth Circuit's elemental test for supervisory liability, which the Court finds congruent with Ninth Circuit requirements:

(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;

(2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and

(3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799 (internal quotations and citations omitted). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* (citation omitted).

To satisfy the deliberate indifference requirement, a plaintiff may demonstrate a supervisor's "continued inaction in the face of documented widespread abuses." *Id.* (citation omitted). "[O]rdinarily, the plaintiff cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, ... A supervisor's continued inaction in the face of documented widespread abuses, however, provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." *Id.* (alterations and citations omitted).

Finally, "[c]ausation is established when the plaintiff demonstrates an 'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff." *Id.* "This concept encompasses cause in fact and proximate cause." *Id.* With this rubric in place, it is clear that no triable issues of material fact exist with respect to the Supervisor Defendants' Section 1983 liability.

### Defendants Tai, Hollister, and Guevara

Defendants Tai, Hollister, and Guevara were informed, to some degree, of the 5150 incident. While there are factual disputes as to what precisely they were told, it is undisputed that they were not on notice of any other conduct by Arevalos that posed an unreasonable risk of harm of constitutional injury to Jane Doe. Indeed, no evidence in the record demonstrates that Arevalos engaged in any misconduct prior to the 5150 incident. Accordingly, Defendants Tai, Hollister, and Guevara did not know that Arevalos was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury. *See Shaw*, 13 F.3d at 799.

Nor do the facts support a finding that they displayed "inaction in the face of widespread abuses." *Id.* Rather, the evidence shows that they were only aware of allegations involving a single isolated instance of misconduct occurring nearly fifteen years prior to Jane Doe's encounter with Arevalos. This showing is insufficient to hold Defendants Tai, Hollister, and Guevara personally responsible for Jane Doe's injuries. *See Starr,* 652 F.3d at 1207–08 ("The requisite causal connection can be established ... by setting in motion a *series of acts* by others," or by "knowingly refus[ing] to terminate a *series of acts* by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury.") (internal citations omitted) (emphasis added). Liability on these facts would eviscerate the framework of supervisory liability and render it nearly indistinguishable from vicarious liability.

Thus, the Court concludes that no genuine issues of fact remain with respect to whether Defendants Tai, Hollister, and Guevara caused a violation of Plaintiff's constitutional rights. Accordingly, Tai, Hollister, and Guevara are entitled to qualified immunity and dismissal from this action.

### Defendant Bejarano

▮ Viewing the evidence in the light most favorable to Plaintiff, Defendant Bejarano had knowledge that Arevalos allegedly engaged in sexual misconduct towards Susy S. However, it is undisputed that Defendant Bejarano had no knowledge of any past incidents involving Arevalos. Thus, for the same reasons as above, Defendant Bejarano cannot be held personally liable for Jane Doe's injuries. He did not have knowledge that Arevalos was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Jane Doe. *See Shaw,*

13 F.3d at 799. Even assuming Defendant Bejarano's alleged inaction was negligent, such inaction is insufficient to hold him personally liable for Arevalos' sexual assault and battery of Jane Doe. Therefore, Defendant Bejarano is entitled to qualified immunity and dismissal from this action.

### Defendants Verduzco and Binkerd

▮ Defendants Verduzco and Binkerd handled the MP complaint. The evidence, viewed in the light most favorable to Plaintiff, demonstrates that Arevalos required MP—scantily clad at the time—to exit her car and bend over to look at her car's registration tab. While Arevalos' behavior was morally suspect—and arguably should have been punished—his actions did not provide Defendants Binkerd and Verduzco with knowledge that Arevalos posed an unreasonable risk of constitutional injury to Jane Doe. MP's allegations placed them on notice that Arevalos lacked basic moral judgment, not that Arevalos would later sexually assault and batter Jane Doe. There are no genuine issues of material fact with respect to whether Defendants Verduzco and Binkerd participated in Jane Doe's constitutional injury, and they are entitled to qualified immunity.

### Defendant Friedman

▮ Plaintiff argues that Defendant Friedman may be held liable under Section 1983 because of his involvement in the Jane Roe case, and because of his general knowledge of Arevalos' suspect behavior.

Beginning with the Jane Roe matter, Plaintiff contends that Friedman is personally liable for her injuries because he knew of Roe's complaint but did not ensure that an immediate criminal investigation was initiated or that a SART exam was conducted. However, it is undisputed that two separate investigations into Roe's allegations were conducted. One was crimi-

nal, conducted by the Sex Crimes Unit; the other was administrative, conducted by Internal Affairs. [Defs.' Statement of Facts ¶ 193.] While Plaintiff contends that these investigations were botched,[13] there are no facts to link Friedman to the quality of the investigations. Moreover, there are no facts to demonstrate that Friedman attempted to cover up the incident; on the contrary, Friedman *reported* the incident to the Watch Command and Internal Affairs. While Plaintiff contends Friedman should have reported the incident as a Category 1 complaint rather than a Public Service Inquiry, the facts demonstrate that the incident was thoroughly investigated.

Nor can Friedman's general knowledge of Arevalos' deviant behavior make him personally liable for Jane Doe's injuries. Specifically, Plaintiff points to the following "facts" as proof of Friedman's liability:

(1) Friedman admitted that he knew Arevalos showed off the driver's license photos of attractive females.

(2) Friedman stated that he believed that Arevalos would use the department's computers to access social networking sites. Yet, he never confronted, counseled, or disciplined Arevalos, and he never contacted Internal Affairs to have Arevalos' computer routinely inspected.

(3) Friedman stated that Arevalos often boasted about stopping "cute girls," and because of this, he spent more time supervising Arevalos than the other officers on his squad. Although Sergeant Friedman stated that Arevalos' boasting was such a concern that he demanded more supervision than any of his other officers, Friedman admitted that he never spoke with Arevalos regarding his concerns.

These additional facts regarding Friedman's knowledge of Arevalos' behavior cannot make him personally liable for Arevalos' acts perpetrated against Jane Doe. Importantly, Arevalos' conduct known to Friedman did not give him knowledge that Arevalos was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Jane Doe. Friedman's awareness that Arevalos stopped "cute girls" and displayed their driver's license photos did not give him knowledge that Arevalos would sexually assault and batter Jane Doe. Thus, supervisory liability under Section 1983 cannot attach to Defendant Friedman, and he is entitled to qualified immunity.

### Defendant Kanaski

 During the time that Officer Arevalos was suspended for the Jane Roe investigation, Officer Arevalos exchanged several emails with Assistant Chief Kanaski. In those emails, Arevalos told Kanaski that Kanaski was the only person who responded to his questions, and then asked when he would be returned to the field, since the District Attorney had rejected the criminal case against him. Defendant Kanaski responded that his "goal was to get [Arevalos] back in the field as quickly as possible. I will not be waiting for the entire investigation to be completed." [Doc. No. 219, Ex. BBBB.] Defendant Kanaski's liability is premised on this misguided comment. However, Kanaski's statement cannot be considered the cause of Plaintiff's injuries. The Internal Affairs investigation was subsequently completed and cleared Arevalos, allowing him to return to the field. Moreover, Plaintiff's expert Jeffrey Noble only opines that Kanaski "engaged in risky behavior contrary to

---

**13.** Plaintiff puts forth an involved theory in which "SDPD upper echelon" foiled the Roe investigation. Even assuming, the truth of this theory, it is irrelevant to the question of whether Friedman acted with deliberate indifference to Plaintiff's rights. Friedman, after all, was not a member of the investigation teams.

the practices of reasonable police managers." This opinion might support a finding that Kanaski acted negligently, but not with deliberate indifference. And "negligence falls short of deliberate indifference." *Washington v. Harrington*, 2012 WL 1910172, *6 (E.D.Cal. May 25, 2012). Thus, Plaintiff has not proffered sufficient evidence to create a genuine issue of material fact with respect to Defendant Kanaski's liability, and he is entitled to qualified immunity.

### *Defendant Lansdowne*

■ Finally, Plaintiff seeks to hold former Police Chief William Lansdowne liable under Section 1983. Primarily, Plaintiff premises liability on Lansdowne's knowledge of two prior events involving Arevalos. First, in March 2007, Officer Arevalos was caught accessing adult porn sites on his computer. Lansdowne received notice of this behavior in conjunction with Arevalos' disciplinary transfer from the detective squad to the Traffic Division. Second, Lansdowne was informed about the allegations against Arevalos stemming from the Jane Roe case. He agreed with the Internal Affairs report which found that the allegations against Arevalos could not be sustained. Additionally, Plaintiff contends that Lansdowne failed to reasonably ensure management oversight to prevent the type of behavior engaged in by Officer Arevalos.

Plaintiff does not produce sufficient evidence to demonstrate a genuine issue of material fact with respect to whether Defendant Lansdowne acted with deliberate indifference towards Plaintiff's constitutional rights. Defendant Lansdowne was made aware of only one incident involving Arevalos' sexual misconduct that rose to the level of a constitutional violation. Moreover, this incident—Jane Roe—was fully investigated. Thus, like the previous

supervisors, Plaintiff has not produced evidence demonstrating that Lansdowne displayed "inaction in the face of widespread abuses." *Shaw*, 13 F.3d at 799.

The remainder of the "facts" presented about Defendant Lansdowne, including the lengthy comments made by Plaintiff's counsel during oral argument, relate to Plaintiff's *Monell* claim, and do not tend to establish that he is personally liable for Jane Doe's injuries.

### D. Remaining Claims

In addition to the Section 1983 claim, Plaintiff asserts eleven other claims against the Supervisor Defendants. Prior to the summary judgment hearing, the Court tentatively granted the Supervisor Defendants' request for summary judgment on these claims. Plaintiff did not object to the Court's tentative ruling. Thus, the Court **AFFIRMS** its tentative ruling as to Plaintiff's remaining claims and enters summary judgment in favor of the Supervisor Defendants.

### CONCLUSION

For the reasons set forth above, the Court **GRANTS** the Supervisor Defendants' motion for summary judgment in its entirety. Accordingly, the Court **DISMISSES** Plaintiff's claims against the Supervisor Defendants **with prejudice.**

**IT IS SO ORDERED.**